
Timothy S. Noon, Esq. (SBN 166193)
Kathy J. Steinman, Esq. (SBN 221344)
**NOON & ASSOCIATES, APC**
501 West Broadway, Suite 710
San Diego, California 92101
Telephone: (619) 235-6200
Facsimile: (619) 235-6233

Attorneys for Plaintiff GLOBAL TECHNICAL SEARCH, INC.
dba GLOBAL SEARCH

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GLOBAL TECHNICAL SEARCH, INC. dba GLOBAL SEARCH, a California Corporation,<br><br>Plaintiff,<br><br>v.<br><br>LELAND JACOBSEN, an individual; and DOES 1 through 25, inclusive,<br><br>Defendants. | Case No. 3:08-CV-00424-BEN-BLM<br><br>**NOTICE OF LODGMENT IN SUPPORT OF PLAINTIFF GLOBAL TECHNICAL SEARCH, INC. dba GLOBAL SEARCH'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge: Hon. Roger T. Benitez<br>Dept.: Courtroom 3<br>Date: March 21, 2008<br>Time: 9:30 a.m. |

GLOBAL TECHNICAL SEARCH, INC. dba GLOBAL SEARCH ("GLOBAL SEARCH") hereby submits the following authority in support of Its Application for Temporary Restraining Order and Motion for Preliminary Injunction:

| NO. | EXHIBIT |
|---|---|
| 1 | A true and correct copy of the employment agreement, titled Independent National Associate Account Executive Employment Agreement dated May 8, 2006 and signed by LELAND JACOBSEN and Michael Burnett; and |

/ / /

/ / /

1
NOTICE OF LODGMENT ISO APP. FOR TRO AND MOTION FOR PRELIMINARY INJUNCTION

| | |
|---|---|
| 2 | A true and correct copy of correspondence dated February 8, 2008, from Attorney William T. Pascoe to Michael Burnett of GLOBAL SEARCH. |

Dated: March 18, 2008

NOON & ASSOCIATES, APC

By: _____
Timothy S. Noon
Kathy J. Steinman
Attorneys for Plaintiff GLOBAL TECHNICAL SEARCH, INC. dba GLOBAL SEARCH

## GLOBAL TECHNICAL SEARCH V. LELAND JACOBSEN
Case No. 3:08-CV-00424-BEN-BLM

### EXHIBITS TO NOTICE OF LODGMENT

| EXHIBIT NO. | DESCRIPTION | PAGES |
|---|---|---|
| Exhibit 1 | Employment Agreement, titled Independent National Associate Account Executive Employment Agreement dated May 8, 2006 and signed by LELAND JACOBSEN and Michael Burnett | 5-9 |
| Exhibit 2 | Correspondence Dated February 8, 2008, from Attorney William T. Pascoe to Michael Burnett of GLOBAL SEARCH | 11-12 |

**EXHIBIT 1**

FR STD 4-83

— *INDEPENDENT NATIONAL ASSOCIATE* —

# ACCOUNT EXECUTIVE EMPLOYMENT AGREEMENT

THIS AGREEMENT is made and entered into in the City of **CARLSBAD**, State of **CALIF**, on this **8th** day of **MAY**, **2006** by and between **GLOBAL TECHNICAL SEARCH, INC. (INA)** (the "Company"), and **TED JACOBSEN** (the "Account Executive"); **(INDEPENDENT NAT'L ASSOC.)**

RECITALS:

A. The Company is engaged in the personnel placement service business and, as such, carries on the business of obtaining positions of employment for candidates and searching out candidates to become employees for employer-clients.

B. The Company has developed valuable confidential techniques and valuable proprietary and confidential forms and methods.

C. The ~~Account Executive~~ **INA** desires to learn said valuable techniques and employ said valuable forms and methods in earning income as an ~~account executive~~ **INA** in the employ of the Company.

D. The ~~Account Executive~~ **INA** acknowledges that he or she does not presently possess sufficient knowledge of the techniques, forms and methods of the Company to proficiently operate as an ~~account executive~~ **INA** in the manner contemplated by both himself or herself and the Company.

E. Both parties hereto acknowledge that the position of an account executive is one of considerable responsibility and requiring such considerable training, relationships and contacts with candidates and employer-clients and experience that it will take a substantial amount of the Company's time to replace an ~~account executive~~ **INA** who has received such training, relationships and contacts with candidates and employer-clients, and experience as are typically afforded by the Company.

AGREEMENT:

NOW, THEREFORE, in consideration of the premises and the mutual covenants of the parties herein set forth, it is hereby agreed:

1. **THE COMPANY.**
   (a) The Company employs the ~~Account Executive~~ **INA** in the capacity of an ~~account executive~~ **INA** for the Company's personnel placement service business. The ~~Account Executive~~ **INA** shall commence his or her employment hereunder on the **8th** day of **MAY**, **2006** at the Company's office situated at (complete address) **1946 KELLOGG AVE, Suite A, CARLSBAD, CA. 92008** (the "OFFICE").

   (b) The Company agrees to assume all of the usual and ordinary expenses involved in providing the ~~Account Executive~~ **INA** with office and working conditions appropriate for the conduct of his or her duties as an ~~account executive~~ **INA**.

   (c) The position of an ~~account executive~~ **INA** is of such importance to the success and profitability of the Company that the Company agrees to train and furnish the ~~Account Executive~~ **INA** with the Company's confidential and proprietary techniques, forms and methods for the ~~Account Executive's~~ **INA** use in his or her employment with the Company so that the ~~Account Executive~~ **INA** may become proficient as an ~~account executive~~ **INA**.

2. **THE ~~ACCOUNT EXECUTIVE~~ INDEPENDENT NATIONAL ASSOCIATE (INA).**
   (a) The ~~Account Executive~~ **INA** accepts the position of employment with the Company as an ~~account executive~~ **INA** and the ~~Account Executive~~ **INA**:
   
   (i) agrees to expend his or her full time and best efforts toward obtaining positions of employment for candidates of the Company; searching out candidates to become employees for employer-clients for whom the Company has agreed to furnish such services; searching out employers to become employer-clients of the Company and such other duties and responsibilities that the Company may, from time to time, assign to the ~~Account Executive~~ **INA**;
   
   (ii) represents and warrants that he or she is not bound by any restrictive covenant which would prevent or restrict the ~~Account Executive~~ **INA**, in any manner whatsoever, from performing his or her duties and carrying out his or her responsibilities as an ~~account executive~~ **INA** for the Company's personnel placement service business;
   
   (iii) agrees that he or she shall not engage in any other business activities in competition with the Company's personnel placement service business;
   
   (iv) agrees, subject to the directions of the Company, to conduct his or her business activities hereunder in accordance with the directives, policies and instructions of the Company in such a manner as to maintain and increase the Company's ethical, moral and professional standards and to maintain and increase the good will and reputation of the Company;
   
   (v) specifically agrees and acknowledges that he or she shall have no authority to enter into any type of contract, agreement or arrangement for or on behalf of the Company, ~~Account Executive~~ or otherwise which might subject the Company to any claims, liability or cause of action, except those made in the normal course of his or her duties as an account executive and made in accordance with the Company's policies and directives;


(vi) agrees to seek out candidates for positions of employment, interview applicants for positions of employment, contact employer-clients to ascertain their personnel requirements, to assist employer-clients in fulfilling their personnel requirements and pursue such other efforts in order to obtain positions of employment for candidates and to provide employer-clients with qualified employees in a confidential nature and in accordance with the Company's procedures, policies, directives and instructions;

(vii) acknowledges that the duties of an *Account Executive* are confidential, sensitive and professional in nature, and that they require the Account Executive to function in a discretionary executive capacity with regard to screening candidates and advising candidates, and employer-clients, assisting them in negotiations, and otherwise developing and managing the areas of the Company's business for which the *Account Executive* is assigned responsibility;

(viii) agrees to pay over to the Company any retainer, compensation, commission, gratuity or other emolument of any kind received during the term of this Agreement from any person, employer-client or candidate in connection with the placement of any person for employment, regardless of whether such placement falls within the scope of the *Account Executive's* ordinary business activities; and

(ix) acknowledges that he or she has been advised of and is cognizant of the Company's longstanding non-discriminatory policies and, in connection therewith, agrees that;
  (A) the screening and referral of candidates for positions of employment shall only be based on said person's qualifications and such person's race, creed, color, religion, sex, age, national origin, marital status, physical handicap, etc. shall not be a factor;
  (B) he or she will not accept a job order from any employer-client which contains any discriminatory provisions unless the employer-client can provide satisfactory evidence to the Company that such discriminatory provision is a bona fide occupational qualification; and
  (C) he or she will not, in any manner whatsoever, code any forms that would in any way indicate race, creed, color, religion, sex, age, national origin, marital status, physical handicap, etc.

3. COMPENSATION.
The *Account Executive's* compensation for the services to be rendered under this Agreement shall be pursuant to the terms, conditions and covenants contained in Exhibit "A" attached hereto and incorporated herein.

4. DEFINITIONS: Trade Secrets.
The parties hereto agree that:
  (a) the term "personnel placement service business" as used in this Agreement shall mean those activities pertaining to placement, recruiting, counseling, testing, resume writing and management consultant functions, finding positions of employment for persons, securing personnel for employer-clients and other similar functions, activities or business;
  (b) the occupation "account executive" as used in this Agreement means those activities of the *Account Executive* when engaged, directly or indirectly, in the personnel placement service business, for his or her own benefit or for the benefit of or on behalf of any other person, as an account executive, counselor, recruiter, assistant manager, manager, owner, partner, associate, shareholder, director, officer, agent, investor, trustee or so engaged in any other similar function or capacity;
  (c) the term "employer-client," as used in this Agreement shall mean an employer, customer, or client including the personnel of such employer, customer or client who has given the Company a job order in person, by telephone, in writing or otherwise and shall include any employer, customer, or client the Company has been soliciting for job orders;
  (d) the term "candidate" as used in this Agreement shall mean any individual who, for purposes of finding a position of employment, has provided the Company with his or her job history information, job history resume, or an application containing job history and other related information in person, by telephone, in writing or otherwise, whether or not the Company actually obtains a position of employment for said individual;
  (e) the term "customer list" as used in this Agreement is not limited to a physical writing or compilation of any number of the names of the Company's customers, employer-clients and candidates and/or the pertinent information relating to them but also includes any and all information whatsoever regarding them whether or not such compilation is mental or physical;
  (f) the term "Company's Proprietary Information" as used in this Agreement means the Company's confidential proprietary information constituting the trade secrets of the Company, including but not limited to information of a technical and business nature pertaining to the Company's personnel placement service business, the identity of candidates, the personal information supplied by candidates, information concerning the identy of employer-clients and their personnel, the personnel needs and requirements of employer-clients and terms and conditions under which the Company deals with employer-clients, other customer lists, training manuals, training tapes, computer programs, films, video cassettes, records, forms, unique techniques, methods and procedures for the operation of a personnel placement service business, the terms and conditions under which the Company deals with other companies engaged in the personnel placement service business or similar types of businesses, its contacts with such companies, its suppliers, etc.;
  (g) all ideas, trade names, service marks, slogans, forms, records, customer lists, procedures, etc. used or owned by and/or licensed to the Company, improved upon, developed or conceived by the *Account Executive*, alone or with others, during the term of this Agreement, whether or not during working hours, that are within the scope of the Company's personnel placement service business, are the exclusive and confidential property of the Company.
  (h) the parties agree that the Company's Proprietary Information may also be trade secrets and by the use of the term "Company's Proprietary Information," the Company does not intend to negate the status of its trade secrets that may be included in the information referred to in Subsection 4(f) and (g) herein.

5. RESTRICTIVE COVENANTS.
In further consideration of the *Account Executive's* employment hereunder, the parties hereto agree to the following:
  (a) that during the term of this Agreement, the *Account Executive* shall not engage in the activities of an account executive, or any other similar function or capacity, in the personnel placement service business for his or her own benefit or for the benefit of or on behalf of any other person. The *Account Executive* further agrees to deliver promptly to the Company, the Company's Proprietary Information at any time the Company requests same from the *Account Executive* and the *Account Executive* agrees not to retain any copies thereof.
  (b) in the event that this Agreement is terminated for any reason whatsoever, voluntarily or involuntarily, the *Account Executive* recognizes that it is necessary to safeguard and protect the Company's business and that it will take considerable time for the Company to hire and train an *Account Executive* to replace the *Account Executive* and therefore, the *Account Executive* agrees to the following, notwithstanding anything herein contained to the contrary:

(i) that upon termination of this Agreement, the ~~Account Executive~~ *INA* shall immediately turn over to the Company the Company's Proprietary Information, including but without limiting the generality of the foregoing, any and all lists, documents, or other types of records and any written, typed or printed materials identifying the candidates of the Company or identifying the employer-clients or personnel of employer-clients together with any and all data involving advertising techniques, candidate processing, forms, correspondence or data in any way involving the Company's techniques, training manuals, training tapes, video cassettes, computer programs, materials, programs, methods or contacts, and that the ~~Account Executive~~ *INA* shall have no right to retain any copies of the foregoing for any reason whatsoever after termination of his or her employment hereunder without the express written consent of the Company;

(ii) that for a period of one (1) year following the effective date of termination of this Agreement, the ~~Account Executive~~ *INA* shall not, directly or indirectly, in any manner whatsoever, in the course of the personnel placement service business, communicate with or provide services to, any candidate or employer-client with whom the ~~Account Executive~~ *INA* had contact with, knowledge of, or access to during the twelve (12) months immediately preceding the effective date of termination of this Agreement, no matter where within the United States the ~~Account Executive~~ *INA* or candidate, or employer-client is located, and shall not assist any other person other than the Company in so doing;

(iii) that for a period of one (1) year following the effective date of termination of this Agreement, the ~~Account Executive~~ *INA*:

(A) shall not engage in the activities of an account executive, manager, owner, partner or any other similar function or capacity in the personnel placement service business within the geographical areas consisting of the area within a fifty (50) mile radius of the OFFICE and also consisting of the Standard Metropolitan Statistical Area, if any, in which said office is then located, for his or her own benefit or for the benefit of or on behalf of any other person; and

(B) shall not compete with the Company in the personnel placement service business in any manner whatsoever within the geographical areas referred to in Subsection 5(b)(iii)(A) hereof, including but not limited to contacting or soliciting any person, in any manner whatsoever, pertaining to the personnel placement service business; provided, however, if the effective date of termination of this Agreement is within six (6) months of date referred to in Subsection 1(a) above, then the foregoing one (1) year time period of this subsection 5(b)(iii) shall be reduced to a six (6) month time period;

(iv) that the Company will suffer material and irreparable damage if the ~~Account Executive~~ *INA* violates Sections 5 or 6 hereof. It is hereby agreed that in the event of such breach or an apparent danger of such breach by the ~~Account Executive~~ *INA*, the Company shall be entitled, in addition to such other remedies available to it, to an immediate injunction to restrain the violation of any or all such provisions by the ~~Account Executive~~ *INA*;

(v) that the actual damages resulting from a breach of Sections 5 or 6 hereof by the ~~Account Executive~~ *INA* will be difficult or impossible to ascertain and that the ~~Account Executive~~ *INA* will be, by such violation, employing the valuable training and experience afforded to him or her by the Company and will be employing the Company's Proprietary Information, that, in the event of such a violation, the ~~Account Executive~~ *INA* agrees to pay to the Company, upon demand, as liquidated damages, and not as a penalty, in the satisfaction of the claims of the Company for such violations and as a payment for the training and experience obtained by the ~~Account Executive~~ *INA* from the Company, the following:

(A) Two Thousand Five Hundred Dollars ($2,500); plus

(B) "Total Daily Damage," which is the total amount of gross profit, (net cash in less compensation payable to the Account Executive, both as defined in Exhibit "A" to this Agreement) earned by the Company during the six (6) month period immediately preceding the effective date of termination of this Agreement, or the full period of this Agreement if it is not in force for at least six (6) months, divided by the number of business days worked by the ~~Account Executive~~ *INA* during said period, and multiplied by the number of business days in the period during which the ~~Account Executive~~ *INA* engaged in activities constituting a breach of sections 5 or 6 hereof; plus

(C) any retainer, commission, compensation, gratuity or other emolument of any kind received by or promised to the ~~Account Executive~~ *INA* from any person or entity pertaining or relating to any violation of Sections 5 or 6 hereof; plus

(D) any fee paid for services rendered in violation of Sections 5 or 6 hereof, whether paid to the ~~Account Executive~~ *INA* or to any other person, firm or entity;

(vi) that if the ~~Account Executive~~ *INA* accepts employment with an employer-client, the ~~Account Executive~~ *INA* shall be jointly and severally liable with the employer-client for the full placement fee which would be payable if a candidate had been hired.

It is agreed that this provision for liquidated damages is fair and equitable and that the amounts set forth above are reasonable under the circumstances.

The parties hereto further agree that the one (1) year and the six (6) month time periods referred to in Subsections 5(b)(ii) and 5(b)(iii) hereof shall be extended to include (a) any period of time in which the ~~Account Executive~~ *INA* is or was engaged in activities constituting a breach of this Agreement and (b) any period of time required to litigate activities of the ~~Account Executive~~ *INA* constituting a breach or apparent breach of this Agreement.

6. COMPANY'S PROPRIETARY INFORMATION.

(a) It is understood and agreed that, in the course of his or her employment hereunder and through the ~~Account Executive~~ *INA*'s activities for and on behalf of the Company, the ~~Account Executive~~ *INA* will receive, deal with and have access to the Company's Proprietary Information and that the ~~Account Executive~~ *INA* holds the Company's Proprietary Information in trust and confidence for the Company.

(b) The ~~Account Executive~~ *INA* agrees that he or she shall not, during the term of this Agreement, or thereafter in any fashion, form or manner, directly or indirectly, retain, make copies of, divulge, disclose or communicate to any person, in any manner whatsoever, except when necessary or required in the normal course of the ~~Account Executive~~ *INA*'s employment hereunder and for the benefit of the Company or with the express written consent of the Company :

(i) the Company's Proprietary Information; or

(ii) any information of any kind, nature or description whatsoever concerning any matters affecting or relating to the Company's personnel placement service business and the Company's personnel placement service.

7. The parties hereto further stipulate that, as between them, all of the items referred to in Sections 5 and 6 hereof are important, material and confidential and gravely affect the effective and successful conduct of the business of the Company, its good will and reputation. Any breach or apparent breach of the terms and provisions of Sections 5 and 6 hereof shall constitute a material and irreparable breach of this Agreement and will subject the Company to immeasurable loss of revenue, business opportunities and good will.

8. INDEMNIFICATION.

The ~~Account Executive~~ *INA* agrees to indemnify and save the Company harmless from any and all manner of suits, claims or demands arising out of the ~~Account Executive~~ *INA*'s activities, breach or apparent breach of this Agreement and to reimburse the Company for any and all costs, damages and expenses, including reasonable attorney's fees, which the Company pays or becomes obligated to pay by reason of such activities, breach or apparent breach.

This Section 8 shall not be construed to void or limit any of the other rights granted to the Company or duties assumed by the ~~Account Executive~~ *INA* pursuant to this Agreement.

7

— 3 —

WAIVER and SURVIVAL.

The failure of the Company to insist upon strict adherence or compliance by the Account Executive [INA] with one or more of the covenants and restrictions contained herein, on one or more occasions, shall not be construed as a waiver, nor shall such course of action deprive the Company of the right to require strict compliance therewith.

10. TERMINATION.

This Agreement shall continue in full force and effect and shall govern all transactions of the parties hereto, until terminated by either party. It is agreed that either party shall have the privilege to terminate this Agreement at any time, with or without cause, by delivering verbal or written notice to the other party specifying the effective date of such termination. Except as otherwise provided for herein, all rights and obligations of the parties hereto shall cease as of the effective date specified in the notice of termination.

11. SEVERABILITY.

In the event that any portion of this Agreement shall, for any reason, be held invalid or unenforceable, it is agreed that the same shall not affect any other portion of the Agreement, but that the remaining covenants and restrictions or portions hereof shall remain in full force and effect, and that if the invalidity or unenforceability is due to the unreasonableness of the time or geographical area covered by said covenants and restrictions, said covenants and restrictions shall nevertheless be effective for such period of time and for such area as may be determined to be reasonable by a court of competent jurisdiction or by an arbitration tribunal.

12. APPLICABLE LAW.

The parties hereto agree that this Agreement shall be governed in all respects by the laws of this State.

13. ARBITRATION.

(a) Except as provided in Subsection 13 (b) hereof, all controversies, claims, disputes and matters in question arising out of, or relating to, this Agreement or the breach thereof, or the relations between the parties, shall be decided by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The parties agree that the arbitration shall take place in the city where the OFFICE is then situated, and shall be governed by the law of this State. The award rendered by the arbitrator shall be final and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof, including a federal district court, pursuant to the Federal Arbitration Act. The arbitrator may grant the Company injunctive relief, including mandatory injunctive relief, in order to protect the rights of the Company pursuant to sections 5, 6, and 7 hereof, but shall not be limited to such relief. The parties specifically agree that this provision for arbitration shall not preclude the Company from seeking injunctive relief in a court in order to protect its rights under said sections 5, 6, and 7, nor shall the filing of such an action constitute waiver by the Company of its right to seek arbitration hereunder. In preparation for the arbitration hearing, each party may utilize all methods of discovery authorized by the procedural rules and statutes of this State, and may enforce the right to such discovery in the manner provided by said rules and statutes and/or by the arbitration law of this state.

(b) The right of the Company to terminate this agreement shall not be subject to arbitration.

14. ENTIRE AGREEMENT.

This Agreement with an Exhibit "A" attached contains the entire Agreement between the parties hereto and there are no representations, inducements, arrangements, promises, or agreements outstanding between them either oral or in writing, other than those herein contained. Any and all employment agreements that the Account Executive [INA] may have had from time to time with the Company or with any of its affiliates or subsidiaries are hereby superseded by this Agreement. No provision of this Agreement shall be changed or modified except in writing and executed by the parties hereto.

15. SUCCESSORS and ASSIGNS.

This Agreement shall be binding upon and shall inure to the benefit of the Company and its successors, assigns, heirs and personal representatives and shall be binding upon and shall inure to the benefit of the Account Executive [INA] and his or her heirs and personal representatives. The Account Executive's interests hereunder are non-assignable.

16. NOTICES.

Except as provided for in Section 10 above, all notices shall be given in writing by registered or certified mail addressed to the Company at the address first above written and to the Account Executive at the address hereinafter written. Either party may designate a different address by written notice to the other party. If notice is hand delivered, the recipient must acknowledge receipt of same on a copy of said notice provided for by the sender. Notices to the Company which are hand delivered can only be received and acknowledged by the Manager of the office in which the Account Executive is working at that time.

17. CAPTIONS and TERMINOLOGY.

The captions to each section herein are used solely for convenience and are not a part of this Agreement, or to be used in interpreting it. Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural. The masculine gender shall include the feminine as well as the neuter gender. The word "person" shall include an individual, candidate, partnership, company, employer, employer-client, corporation, firm, association, other entity or otherwise.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement in multiple counterparts with each counterpart being deemed an original, and the counterparts together shall constitute one and the same instrument, as of the day and year first above written. The Account Executive hereby acknowledges receipt of an executed copy of this Agreement.

PLEASE PRINT OR TYPE THE FOLLOWING:

Ted Jacobsen
Account Executive's full name

27735 Mtn. Meadows Rd #16
Home Address

Escondido    CA    92026
City         State  Zip

(760) 751-4055
Residence Telephone

The Account Executive [INA], by his or her signature hereto, acknowledges that he or she has had adequate opportunity to review the foregoing Agreement and that he or she is signing this Agreement of his or her own free will without any duress or coercion being applied to him or her by the Company.

THE COMPANY:

By: _____
Duly Authorized Agent of the Company

_____
Account Executive's Signature
[INA]

—8—
—4—

# GLOBAL TECHNICAL SEARCH, INC ( The Company )

## EXHIBIT "A"

SECTION 3) COMPENSATION:

Independent National Associate (INA) shall be paid a weekly draw of $350.00 per week for expense reimbursement. That reimbursement will be for auto, business, travel, etc., related expenses. A commission will be paid on all placements closed by INA pursuant to the attached schedule. Taxes will be taken out of the commission per the INA W-4. There will be a 90 day probationary period of association with the "Company", before full INA status is achieved.

Any increase beyond $1400.00 per month shall be at the sole discretion of the "Company" and will be based upon performance and production. Any increase in the monthly reimbursement will be considered a "draw" against commissions. The "draw" can be withheld against any salary or commission due the INA upon termination or resignation.

Commissions are paid as outlined in "Guidelines and Commissions" and will only be paid to an INA after the candidate "placed" has started and the agreed guarantee period has past. Only an INA, still with the "Company" and in good standing will be due any commission.

SECTION 6) PROPRIETARY INFORMATION

INA understands and agrees that some time may be spent at home in the course of doing work for the "Company" and that all information, files, etc. are property of the "Company".

_____        5-8-06
Independent National Associate                              Date

9

# EXHIBIT 2

# WILLIAM T. PASCOE
## ATTORNEY AT LAW

February 8, 2008

Mr. Michael Burnett
Global Technical Search, Inc.
1946 Kellogg Ave., Suite A
Carlsbad, CA 92008

   **Re: Ted Jacobsen v. Global Technical Search, Inc.**

Dear Mr. Burnett:

I have been retained by Mr. Ted Jacobsen concerning the termination of his employment. For further purposes, please direct all correspondence to the undersigned and please address the points which I raise in this letter.

First and foremost, demand is hereby made pursuant to California Code Labor, Section 1198.5 that you immediately produce a copy of the entire personnel file belonging to Mr. Jacobsen. According to California law, the employer is required to assemble all components of the personnel file, which includes any documents reflecting the decision to hire, terminate, promote or demote the employee. By necessity, this information would also include any pay and salary information.

By implication, this would include any agreements, commission structures or commission schedules. In addition, any records of payments made to Mr. Jacobson would be reflected in any personnel file that was up to date and current. In addition, any written agreements, including any alleged covenants or agreement not to compete, should be immediately produced to my attention. If there are any subparts or modifications to such agreements, please include those agreements in addition to the covenant or agreement not to compete.

Second, I have been made aware that you are attempting to enforce an agreement not to compete. However, a covenant not to compete is *per se* unenforceable in the State of California. See Business and Professions Code Section 16600, which provides that such agreements are against public policy and are unenforceable. Accordingly, any agreement which Mr. Jacobsen signed is unenforceable *per se* and, more importantly, any representation that prospective clients should not be contacted by Mr. Jacobsen could subject you and Global Technical, Inc., to liability for interference with contract, among other causes of action and complaints. To put it plainly, Mr. Jacbosen is free to contact any former clients or business connections with whom he established any relationship, whether or not they are a current client of Global Technical Search, Inc. Any threats, implied or expressed, to interfere with Mr. Jacobsen's right to compete and make a living will be met with prompt and aggressive response.

In fact, former employers in the state of California who have attempted to assert such covenants have been successfully sued for business torts including unfair competition and interference with contract. Therefore, you would be well advised to immediately cease and desist from making any statements to any prospective or existing clients that Mr. Jacobsen is prohibited from competing with Global Technical Search, Inc.

Third, Mr. Jacobsen has brought to my attention the fact that he is still owed a commission check in the amount of $12,700.00 for a placement which was completed in 2007, as well as $3,500.00 in earned bonus money that was to be allocated to a fully paid vacation. According to Mr. Jacobsen, the check was deposited into Global's bank account on December 31, 2007, and that the commission amount owed to Mr. Jacobson is $12,700.00 based upon the commission schedule. In addition, you have already agreed and admitted orally to Mr. Jacobson that this commission is due and owing to Mr. Jacobsen. Likewise, based upon Mr. Jacobsen's performance in 2007, he would have qualified for the paid vacation, the value of which was limited to $3,500.00. Under the California Labor Code, these monies were due upon termination of Mr. Jacobsen, and they must be paid forthwith.

In closing, please immediately send the commission check for the proper amount to Mr. Jacobsen at his address, which is 37444 Hydrus Place, Murrieta, CA, 92563. With the exceptions of the commission check, please send any and all correspondence to the undersigned because I will be representing Mr. Jacobsen and representing his interest throughout the course of this dispute.

If you have any questions or concerns about this letter, you may contact me directly, or you may direct your counsel to contact me. Otherwise, we expect prompt compliance with the demands made in this letter, and we expect a reply within 15 days.

Please call me if you should have any questions or concerns. Thank you for your prompt attention to this matter.

Very truly yours,

William T. Pascoe

WTP:kw